#25779, #25786-r-JKK

**2011 S.D. 85**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MORRIS, INC.,                                          Plaintiff and Appellee,

    v.

STATE OF SOUTH DAKOTA,
BY AND THROUGH THE
STATE DEPARTMENT OF
TRANSPORTATION, A STATE AGENCY,          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
STANLEY COUNTY, SOUTH DAKOTA

* * * *

HONORABLE KATHLEEN F. TRANDAHL
Judge

* * * *

RONALD G. SCHMIDT of
Schmidt, Schroyer, Moreno,
  Lee & Bachand, PC                          Attorneys for plaintiff
Rapid City, South Dakota                     and appellee.

JEFFREY SVEEN
JULIE DVORAK of
Siegel, Barnett & Schutz LLP                  Attorneys for defendant
Aberdeen, South Dakota                       and appellant.

* * * *

ARGUED ON APRIL 28, 2011

OPINION FILED **12/14/11**

KONENKAMP, Justice

[¶1.] In this breach of contract action against the South Dakota Department of Transportation (DOT), the circuit court ruled in favor of Morris, Inc. after a nine-day bench trial. The court awarded Morris $1,528,887 in damages, with $771,238.30 in prejudgment interest, and $20,035.47 in disbursements. The DOT appeals, challenging the basis for the court's conclusion that it breached any contractual obligations to Morris. The DOT further disputes the calculation of the court's damages award, and prejudgment interest. On notice of review, Morris asserts that the court erred when it failed to include expert witness fees as disbursements.

## Background

[¶2.] In October 2004, Border States Paving, Inc. was awarded the prime contract by the DOT for a road project on U.S. Highway 83 in Lyman and Stanley Counties, South Dakota. The total contract was for $13,614,621.22. On November 24, 2004, Border States entered into a subcontract with Morris, Inc. for aggregates and work on the project for $2,923,317.99. Three asphalt mixes were to be used: base course, Superpave, and Class S. Border States scheduled the project so that all asphalt paving operations would be completed by September 15, 2005, which coincided with the end of the Class S seasonal deadline.

[¶3.] The relationship between Border States and the DOT was circumscribed by multiple documents. These documents, among other things, prescribed the parties' obligations with respect to the aggregates. Thus, although Morris subcontracted to produce and procure for Border States the necessary

aggregates, Border States, as the prime contractor, was the responsible party under the contract. The subcontract agreement provided that Morris's work was subject to inspection and acceptance by the DOT. Morris's actions are primarily at issue here.[1]

[¶4.]     On December 9, 2004, the DOT held a preconstruction meeting, at which Morris informed the DOT that it intended to provide materials for the project from the Durkin/LBT Pit, Mahutga Pit, and Richards Pit. And all Class S materials would come from the Durkin Pit. Morris was aware that regardless of where the materials came from, those materials had to meet the requirements of the controlling agreements.

[¶5.]     As to the Class S materials, a major controlling document was the Standard Specifications for Roads and Bridges (Standard Specifications). Specification 325 provided that all Class S materials "shall conform to Section 320.2." Section 320.2, entitled "Materials," included a subheading, "Aggregates," which must conform to Section 880. Standard Specifications 320.2B. Specification 880.2A provided a table listing what requirements the Class S mineral aggregate must conform to in regard to certain tests. For the sodium sulfate soundness test, the table set a maximum limit of 12% for both the plus and minus four. Specification 880.3 provided that a sodium sulfate soundness test would be conducted under the SD220, five cycles. For lightweight particles, the table allowed a maximum of one percent loss for the plus and minus four. *Id.* at 880.2A. Finally, the table provided the required mineral aggregate gradations. But the parties'

_____

1.     Border States assigned any claims it may have against the DOT to Morris.

contract contained a specific provision overriding Specification 880.2A as it related to gradations. *See* Contract Plan Sheet F-3.

[¶6.] On March 11, 2005, Morris started crushing for the Superpave paving. Morris knew the contract required it to submit the proposed Superpave mix design at least fifteen working days before the scheduled paving start date. Morris and Border States were also aware that the contractor (Border States) must perform certain tests and submit certain test results when providing the DOT with materials to test. *See* Standard Specification 320(C)(2). Border States did not have its own testing lab, and therefore, hired Aaron Swan & Associates (Swan) to do all the necessary testing for the Superpave and Class S paving on the project. On June 13, 2005, Morris submitted a mix design to the DOT for the Superpave. Morris reported a sodium sulfate soundness result from Swan at 6.6% on the plus four and 6.1% on the minus four (passing, as the DOT sets a maximum of 15% on the plus and minus four). The DOT then tested the materials using its SD220 testing protocol and issued the results of its sodium sulfate soundness test on June 16, 2005. The submitted Superpave materials passed with a 15% on the plus four and 12% on the minus four.

[¶7.] While the Superpave material passed the DOT's test, Morris was concerned with the results because the plus four was borderline failing, and the DOT runs sodium sulfate soundness testing on every 50,000 tons of Superpave. Morris planned on using similar materials for the Class S paving, which had a lower soundness requirement of 12% on the plus four. As a result of these concerns, Morris communicated with DOT personnel and questioned the DOT's sodium

sulfate soundness testing. According to Morris, this occurred around June 16, 2005, but the DOT contended that Morris did not complain until July 2005. Nonetheless, the DOT, Milt Morris, Chad Hicks (Morris's in-house testing person), and Howard Schill of Swan met and discussed Morris's concerns. They agreed to conduct a round robin sulfate soundness test on the plus four aggregates, using split samples from the Durkin Pit. They also agreed to depart from the SD220 and run the soundness test with a redrain/repour method. *See Bowes Const., Inc. v. S.D. Dept. of Transp.*, 2010 S.D. 99, ¶¶ 19-24, 793 N.W.2d 36, 43-44 (discussing the SD220 and the double pour/repour method).

[¶8.] Sometime after July 22, 2005, Hicks, Swan, and the DOT ran a sodium sulfate soundness test on the plus four materials submitted by Morris as part of the agreed-upon round robin. On August 2, 2005, Jim Costello of the DOT orally advised Hicks that the Class S material passed the plus four soundness test. This, as it turned out, was incorrect. The materials actually failed with a 13.67% loss on the plus four. Costello testified that he told Hicks the results without first submitting them to the Central Lab, although he knew that sodium sulfate soundness test results were supposed to be reported to the DOT area engineer at the Central Lab. Costello explained that he told Hicks the results because he was trying to help speed up the process, knowing that the Class S submissions were behind schedule.

[¶9.] The error was ultimately discovered by Rick Rowen of the DOT on August 10, 2005. Costello was on vacation and Rowen was in charge of testing. Rowen reviewed the calculations from the DOT and Swan on the materials

submitted for the round robin and discovered the error. After recalculating the soundness loss, the DOT's sodium sulfate test result showed a failing loss at 13.67%, Swan a failing result at 14.36%, and Morris's in-house test result passing at an 8.88% loss. Rowen reported the calculation error to his supervisor, Tom Grannes, who reported it to his supervisor, Joe Feller. Border States and Morris, however, were not informed of the error and ultimate failed test until August 16 or 18, 2005.

[¶10.] After informing Border States and Morris of the failed soundness test, the DOT directed Morris to submit a new mix design. On August 18, 2005, Morris submitted a new mix design, which contained 3/8" crushed chips from the Richards pit, and new bin splits to run a new sodium sulfate soundness test for the Class S mix design. The DOT worked through the weekend to run the necessary tests. The aggregates and bin splits failed with an 18% loss on the plus four and 13% loss on the minus four.

[¶11.] After its August 18 failed test, Morris did not submit any additional materials to the DOT for some time. Instead, Border States worked directly with the DOT. On August 23 and 24, Border States submitted new Class S bin splits, which included 5% Spencer quarry rock and 3/8" Richards chips from Morris's August 18th submission. On August 26, 2005, the DOT issued Border States a completed mix design, using the materials and bin splits submitted to the DOT by Border States on August 24, 2005. A completed mix design means, among other things, that the aggregate materials passed the DOT's sodium sulfate soundness testing. The DOT was able to hand calculate the sodium sulfate soundness test by

using soundness results of prior DOT testing because Border States had submitted materials (Spencer quarry rock) familiar to the DOT on August 23 and 24.

[¶12.]      On August 27, 2005, Border States prepared for Class S paving. But between August 27 and August 29, 2005, Border States failed the first six asphalt plant calibrations. While the materials passed the DOT's sodium sulfate soundness testing, there are other tests the DOT runs. Border States failed the asphalt plant calibrations because the composite was not within specifications for lightweight particles and gradations. Therefore, on August 29, 2005, Border States, with the assistance of Morris, submitted another set of Class S bin splits to the DOT. These submissions eliminated certain Durkin material because of excessive lightweight particles. That same day the DOT issued Border States a completed mix design using the materials and bin splits submitted. On August 30, 2005, however, Border States failed its asphalt plant calibration because the aggregate composite was not within lightweight particle and gradation requirements. On August 30, 2005, Border States submitted to the DOT two more sets of Class S bin splits, which further reduced the amount of Durkin material and increased the amount of 3/8" Richards chips. On August 30 and 31, 2005, Border States failed the next three plant calibration tests because of lightweight particles and gradation.

[¶13.]      Border States continued to submit materials to the DOT in an attempt to meet its September 15, 2005 deadline. On September 1, 2005, Border States submitted two more sets of Class S bin splits, which further reduced the amount of Durkin material because of excessive lightweight particles. On September 2, 2005, the DOT submitted a completed mix design to Border States, using the materials

submitted and suggested by Border States. That same day, however, Border States and Morris submitted new proposed bin splits to the DOT, which proposed 7% Spencer quarry rock and the remainder Morris materials. Ultimately, Border States could not use the mix design proposed by Morris in the field because it called for 7% Durkin dust, and the Durkin dust would not work.

[¶14.] On September 2, 2005, Border States decided to leave the project and come back in 2006, because there was not enough time to complete the Class S paving by the September 15, 2005 seasonal deadline. Border States resumed Class S paving on June 14, 2006 and satisfactorily completed the project. In 2006, Morris provided the necessary aggregates and passed all of the DOT's required testing. Upon completion of the project, the DOT paid Border States in full. Border States withheld $756,651.68 from Morris for costs associated with the project in 2005, because it believed Morris defaulted in its contractual obligations under the subcontract.

[¶15.] Through Border States, Morris brought a claim against the DOT in accord with Specification 5.17.[2] Under that specification, the DOT requires, among other things, that the contractor give the engineer written notice of a claim for additional compensation. The DOT denied the claim, after which Morris brought suit in circuit court against the DOT. Morris alleged that the DOT "breached its express and implied contractual obligations owed to Morris[.]" It also claimed that

---

2. On October 24, 2006, Border States submitted its direct claim and Morris's claim against the DOT under Specification 5.17. On September 5, 2007, the DOT advised Border States and Morris that the claims were denied.

the DOT breached its implied contractual obligation of good faith and fair dealing. Morris asserted that the DOT acted arbitrarily, capriciously, and abused its discretion in its application of the sodium sulfate soundness test procedures and methodologies. Finally, Morris claimed that the DOT failed to follow certain reasonable construction standards. From these breaches and failures, Morris averred that it was directly harmed and damaged.

[¶16.] A court trial was held for nine days between May 11 and May 27, 2009. Fourteen witnesses testified, and multiple volumes of exhibits were admitted into evidence. At the conclusion of the trial, the court directed the parties to propose findings of fact and conclusions of law and objections. On September 13, 2010, the court issued amended findings of fact and conclusions of law and a judgment. The court issued 420 findings of fact and 28 conclusions of law. Essentially, the court held that the DOT "breached express and implied contractual duties and obligations . . . [and] that as a proximate result caused detriment and damage to Border States and Morris[.]" It further ruled that the DOT breached its duty of good faith and fair dealing, which prevented Morris from receiving the expected benefits of the contract. The court held that the DOT "acted manifestly arbitrary, capriciously, and in bad faith" related to certain acts and failures to act. Finally, the court ruled that the DOT failed to follow reasonable construction standards, which failure proximately damaged Morris. The court awarded Morris damages of $1,528,887, with $771,238.30 in prejudgment interest and $20,035.47 in disbursements.

[¶17.] The DOT appeals, asserting that the court erred in (1) ruling that the DOT breached the contract, acted arbitrarily and capriciously, abused its discretion,

and violated its duty of good faith and fair dealing; (2) concluding that the alleged breaches proximately caused damage to Morris; (3) adopting nearly verbatim Morris's proposed findings of fact and conclusions of law; (4) awarding financing fees as an element of damages; and (5) calculating the date of loss and prejudgment interest.[3]

## Analysis and Decision

### 1. Breach of Contract and Implied Obligations

[¶18.]     The circuit court declared in multiple findings of fact and conclusions of law that the DOT breached its contract, whether express or implied, and violated its duty of good faith and fair dealing.

*a. The DOT's Application of the SD220.*

[¶19.]     At trial, Dick Root, Morris's expert, testified that the SD220, in conjunction with the C88, has "poor, extremely poor" precision. *See Bowes Const., Inc. v. S.D. Dept. of Transp.*, 2010 S.D. 99, ¶ 4, 793 N.W.2d at 38 (discussing the C88). Root said that a failing result under the SD220 is not a "prudent engineering rationale for rejecting sources of aggregates in South Dakota[.]" After comparing the soundness information and testing history in South Dakota with the results of private labs, Root opined that the DOT's sodium sulfate soundness test has a high bias in relation to other states. Root said that the SD220 should be conducted with a "continuous pour" or a repour. During the oral argument to this Court, counsel

---

3.     Standard of review: contract interpretation is a question of law reviewed de novo. *Schulte v. Progressive Northern Ins. Co.*, 2005 S.D. 75, ¶ 5, 699 N.W.2d 437, 438 (citations omitted). Findings of fact are reviewed for clear error. SDCL 15-6-52(a).

for Morris explained that had the DOT appropriately considered the poor precision of the SD220, Morris's materials would have passed the sodium sulfate soundness testing and the project would have been completed on time.

[¶20.]     Based on Root's testimony, the circuit court found that the DOT's "application and interpretation of the SD220 modification to the ASTM C88 [was] arbitrary and capricious, an abuse of discretion and lack[ed] good faith and fair dealing." The court further ruled that the DOT waived its right to perform the sodium sulfate soundness test in accord with the SD220 "for the purposes of the August 26, 2005 Class S job mix formula/mix design" because it abandoned the SD220 procedure and used a repour for the round robin testing.

[¶21.]     The DOT first argues that under *Bowes Construction, Inc.*, the circuit court erred when it ruled that the SD220, as performed by the DOT, has a high bias or is an imprecise test, because this Court specifically said the SD220 does not require a repour/double pour. *See* 2010 S.D. 99, ¶¶ 19-24, 793 N.W.2d at 43-44. Moreover, the DOT maintains that it could not have acted arbitrarily, capriciously, abused its discretion, or violated its duty of good faith and fair dealing because the express contract language controls. In particular, the DOT emphasizes that Morris was aware that its materials must pass the SD220 and all other testing.

[¶22.]     In making the broad declaration that the DOT violated its obligation of good faith and fair dealing, the circuit court cited no provision in the contract that necessitated "fill[ing] the gap" with principles of good faith. *See Farm Credit Serv. of Am. v. Dougan*, 2005 S.D. 94, ¶ 10, 704 N.W.2d 24, 29 (citation omitted). Nor did the court specify how the DOT acted arbitrarily, capriciously, or abused its

discretion.  It is undisputed that Morris knew it was required to submit materials to the DOT that passed the DOT's testing requirements as set forth in the contract and controlling documents.  Those express contract terms required Morris to submit materials for testing that did not exceed sodium sulfate soundness of 12% on the plus and minus four for the Class S materials.  While the C88 indicates that the precision method of the test is "poor," it does not prohibit the rejection of material for a failing score.  In fact, the C88 only specifies that the test "*may not* be suitable for outright rejection of aggregates without confirmation from other tests more closely related to the specific service intended."  (Emphasis added.)  There was also no evidence that Morris or Border States could reasonably believe that the DOT would pass an aggregate with a failing SD220 score.  And even if the DOT had taken into account the C88 poor precision factor, Morris fails to address the fact that its materials failed other tests, namely the lightweight particles and gradations tests.

[¶23.]      Another factor not addressed by the circuit court is the contract requirement that before submitting materials to the DOT, the contractor must run certain tests.[4]  There was no evidence that Morris or Border States submitted

---

4.      Standard Specifications 320.3(C)(2) provides in part:

> The Contractor shall run process control tests on the mineral aggregate when producing material.  A gradation, PI, crushed and lightweight particles test shall be run for every 1500 tons (1500 metric tons) produced per pile.  The Contractor shall also test the quality (abrasion and soundness) of the mineral aggregate.  The quality should be tested once per source.  All sample and testing shall be accomplished in accordance with the South Dakota Department of Transportation Materials Manual.

results of any tests for the July and August 2005 materials. Had Morris and Border States conducted the required testing before submitting its samples, they might have learned of its quality and acceptance issues.

[¶24.]     Because there is no support in the record for the circuit court's broad conclusions and findings, it was error to conclude that the DOT arbitrarily and capriciously applied and interpreted the SD220 as modified by the C88, abused its discretion, and violated its duty of good faith and fair dealing. The court further erred when it ruled that the DOT waived its right to apply the SD220 without a double pour/repour by using the double pour for the round robin testing.

      *b. Referee Lab*

[¶25.]     Morris asserted at trial that the DOT was required to bring in a referee lab whenever its testing is "questioned." *See* Program Manual, Glossary of Terms, "Dispute Resolution." Because Morris expressed concern, i.e., questioned the DOT's sodium sulfate soundness test on Morris's June 2005 materials, Morris urged that a failure to bring in a referee lab was a breach of contract. The Program Manual provides:

> When an action is questioned, another independent non-biased authority is brought in to determine a resolution to the dispute. This may involve, but is not limited to, retesting of a sample or an in-place product.

Based on this language, the court ruled that the DOT "breached its contractual duty and obligation, acted manifestly arbitrary, capriciously, and in bad faith by failing to bring in any third-party unbiased referee lab when Morris and Aaron Swan challenged and disputed the SD220 soundness test procedures[.]"

[¶26.]    In response, the DOT asserts that the SDDOT Quality Systems Manual (QSM) controls.  That manual provides a more detailed dispute resolution procedure.  During the oral argument to this Court, counsel for the DOT asserted that the QSM was incorporated into the parties' contract because Specification 7.5 requires that all work is subject to inspection by the United States Government "in accordance with the applicable Federal Statute and rules and regulations," and the QSM was prepared and required in part by the Federal Highway Administration, referencing 23 CFR § 637.  From our review of Specification 7.5 and the testimony cited by counsel for the DOT, we cannot say the circuit court erred when it found that the QSM was not part of the parties' contract.  Nothing in Specification 7.5 or the QSM mentions 23 CFR § 637.  Therefore, while the parties' work is controlled by federal rules and regulations, the connection between the QSM's dispute resolution provision and the parties' contract is not evident.

[¶27.]    Nonetheless, the DOT argues that the dispute resolution provision relied on by Morris does not apply to the sodium sulfate soundness testing, because the Program Manual applies to "acceptance" testing, and the sodium sulfate soundness testing is a "quality" test. While the Program Manual references "acceptance" testing and does not specifically say "quality" testing, it would be imprudent to conclude outright that the Program Manual has nothing to do with

sodium sulfate soundness testing.[5]  Thus, we address whether the DOT was required to bring in a referee lab.

[¶28.]     Although Morris never brought a formal complaint against the DOT challenging its soundness testing procedures, we cannot say that the dispute resolution provision of the Program Manual was not implicated by Morris's actions. Trial testimony and evidence established that Morris questioned the DOT's results and expressed concern about Morris's materials passing future tests.

[¶29.]     Yet while the DOT might have violated the dispute resolution definition in the Program Manual, there is no evidence that had an independent unbiased authority been called in, Morris's materials would have passed the sodium sulfate soundness testing.  In fact, after Morris questioned the test and the DOT agreed to do the round robin testing, Morris's materials failed not only the DOT's test, but Swan's, the tester hired by Border States to test Morris's materials.  There being no evidence that the failure to bring in an independent unbiased authority harmed Morris, the court erred in concluding that the lack of a referee lab was to Morris's "detriment and damage as a matter of law."

### c. Error in Calculating Test Results

[¶30.]     It is undisputed that the DOT erred when it orally notified Morris on August 2, 2005 that Morris's materials passed the soundness test.  Moreover, it was a clear violation of DOT policies and procedures that the DOT orally informed

---

5.     The Program Manual, 1(I) provides, "The Federal Highway Administration . . . requires that all individuals performing *acceptance testing*, independent assurance testing, or inspection shall be certified . . . ."  (Emphasis added.)

Morris of the results without first submitting them to the engineer at the Central Lab. The parties disagree over when exactly Morris and Border States were informed of this error. For the purpose of this appeal we accept August 18, 2005, Morris's claimed date, as the relevant date.

[¶31.]    Morris presented evidence that after the DOT orally informed it of the passing results, the DOT gave Border States bin splits on August 4, 2005 for the Class S mix design. The bin splits contain the mix design and are necessary to prepare for production. When the DOT gave Border States the bin splits, Border States was informed that the mix design would possibly be approved on August 5, 2005. (Simply because certain aggregate materials pass soundness testing does not mean that a mix design, which is subject to additional testing, will pass.) An approved mix design would allow Border States to calibrate its plant in preparation for Class S paving. In this case, however, Border States was not finished with Superpave paving until August 24, and therefore, could not have prepared to calibrate its plant or start Class S paving until after August 24, 2005.

[¶32.]    Nonetheless, the court concluded that the DOT's "calculation error and concealment of the error caused Border States and Morris in excess of a three-week delay in obtaining a passing Class S mix design utilizing 100 percent Morris material." The court ruled that the DOT

> Engineers [sic] decisions concerning the Class S Round Robin sodium sulfate soundness test calculation error on or about August 2, 2005, discovery of the error on August 10 and failure to disclose the error to Border States and Morris until sometime between August 16 and August 18, and resulting intentional decisions to forgo all contractually required quality tests and the Section 320 tolerances and the requirement for the use of the Spencer aggregates in order to rush through a job mix

> formula/mix design in two days due to their error, breached numerous contractual duties and obligations as well as the contractual duty and obligation of good faith and fair dealing to the detriment and damage of Border States and Morris as a matter of law.

Finally, the court held that the delays caused by the DOT "after August 2, 2005, resulted in the carryover of the Class S aggregate and paving work into the 2006 construction season, . . . and proximately resulted in detriment and damage to Border States and Morris which is compensable as a matter of law."

[¶33.]    The DOT claims that Morris failed to establish that the DOT's error and the resulting delay proximately caused Morris's alleged damages.  It emphasizes that Morris failed to properly plan for the Class S mix design and continued to submit failing materials, even after August 2, 2005.  Indeed, Morris made four attempts to submit passing materials between August 18 and September 2, 2005.  Each submission during that time failed, and according to the DOT, the failures were a result of Morris's inadequate pre-bid work to determine the quality of the aggregates.

[¶34.]    A review of the court's findings reveals no explanation supporting the conclusion that the DOT's error on August 2, 2005 proximately damaged Morris. "An action for breach of contract requires proof of an enforceable promise, its breach, and damages." *McKie v. Huntley*, 2000 S.D. 160, ¶ 17, 620 N.W.2d 599, 603 (citation omitted).  In every breach of contract case, there must be a causal relationship between the alleged damages sustained and the breach.  *Id.* ¶ 18. Here, the court provided no proximate cause explanation, but simply concluded that Morris's damages were proximately caused by the DOT's error.  Moreover, the court

erroneously concluded that the error caused Morris a three-week delay in obtaining a Class S *mix design* with 100 percent Morris material. The DOT did not report on August 2, 2005 that Morris had a passing "mix design." In fact, Morris's evidence revealed that while the DOT gave Border States bin splits after August 2, the *mix design* was not yet approved. From the evidence in the record, there is no proof that the materials submitted by Morris resulting in the erroneous August 2, 2005 pass report would have passed all subsequent tests and become a passing "mix design."

[¶35.]     Furthermore, the court's use of the phrase "100 percent Morris material" is confusing. It is undisputed that while the materials used for the August 2, 2005 result came from the Durkin Pit (Morris's material), Border States submitted bin splits on August 23 and 24, 2005 that contained material other than Morris's. Border States notified Morris by letter that it intended to submit materials to the DOT for testing, which materials were not Morris's. How could the court conclude, then, that the DOT caused a three-week delay preventing Morris's use of 100 percent Morris material?

[¶36.]     Finally, we find no support in the record for the circuit court's conclusion that the DOT's error caused the Class S paving project to be carried over into 2006. No evidence can be found in the record that Morris would have submitted a passing Class S mix design had the DOT not made the error. Indeed, from August 18 through September 2, 2005, either Border States or Morris continued to submit materials to the DOT for testing, materials that failed either in the lab or in the field. From this record it cannot be deduced that because the DOT erroneously reported a pass on a *sodium sulfate soundness test*, the materials

submitted by Morris at all other times would ultimately have passed all other quality and acceptance testing performed by the DOT. Morris did not present expert testimony on this and the court never addressed it. There being no evidence that the DOT's error on August 2, 2005 proximately caused Morris's alleged damages, the court erred in so concluding.

### d. Averaging the Round Robin Results

[¶37.]    At some point after June 21, 2005, Milt Morris, Chad Hicks, Howard Schill, and certain DOT employees met to address Morris's concerns about the DOT's sodium sulfate soundness results. As a result of the meetings, the DOT, Hicks (on behalf of Morris), and Schill (on behalf of Swan) agreed to run a round robin test, whereby Morris, Schill, and the DOT would test splits of the same material in the same way. They agreed that the soundness test would be run contrary to the procedure SD220/C88 by using the double pour/repour method employed by Schill. They also agreed that 100 percent Durkin material would be used. The soundness test was to be run on the Class S plus four material only. Hicks would bring the material to the DOT and the DOT would divide it three ways and deliver it to Morris and Swan in individual pans. After the testing was complete, Morris and Swan were to report their raw calculations to the DOT, and the DOT would run the soundness calculations. The results of the round robin were: the DOT reported a sodium sulfate test result with a failing loss at 13.67%; Swan a failing result at 14.36%; Morris a passing result at 8.88% loss. The DOT did not average the results of the three tests, as the round robin was conceived as merely a way to compare test results. Indeed, Milt Morris testified that the purpose

of this round robin was "to have something that we could correlate our making material based on tests that were legitimate, that were comparable to what everybody else was getting."

[¶38.]    At trial, Morris's expert, Root, testified that the industry standard is to average round robin test results, as "the average of three is a much stronger number than an individual value by the square root of 3[.]"  Root further testified that had the DOT averaged the results, the material would have passed the soundness test.  Adopting Root's opinion, the court found that the DOT "breached its duty and obligation by not averaging the results of the Round Robin soundness testing."  The court further concluded that "[a] reasonable construction standard is the use of averaging of multi-laboratory Round Robin test results, and the SDDOT failed to follow the standard by not averaging the three laboratory soundness results from the Class S Round Robin which would have passed and resulted in a fully acceptable Class S job mix formula/mix design using 100 percent Morris Durkin Material to Morris' detriment and damage."

[¶39.]    In support of its holding, the court declared that a "reasonable construction standard" applies in this case concerning the materials testing by the DOT.  This is incorrect.  Foremost, the contract and agreements between the parties control the materials testing by the DOT.  Then, related to the round robin testing, while the DOT agreed to deviate from the SD220/C88, there is no evidence that the parties intended to employ or apply an *industry* round robin test as testified to by Root.  Rather, the record is clear that Morris, Swan, and the DOT discussed and developed the parameters of the intended round robin test.  Morris makes no claim

that he requested that the DOT average the results from the three labs. Moreover, there is no evidence to support the court's far-reaching conclusion that had the DOT averaged the results the round robin would have "resulted in a fully acceptable Class S job mix formula/mix design using 100 percent Morris Durkin Material to Morris' detriment and damage." As discussed earlier, a passing sodium sulfate soundness test score does not mean that the ultimate *mix design* would pass and be acceptable. The round robin only tested the sodium sulfate soundness of the material, on the plus four. There being no evidence that the parties agreed to average the results of the round robin, the court's conclusion that the DOT breached its duty and obligation in this respect was erroneous.

### e. Lightweight Particle Testing

[¶40.] Morris presented evidence at trial to support its claim that the DOT was required to run lightweight particles testing before "formalizing" a Class S mix design. On August 26, 2005, the DOT issued Border States a completed mix design. The DOT did not perform any lightweight testing on the August 26, 2005 mix design before August 26. Between August 27 and August 29, 2005, Border States failed the first six asphalt plant calibrations because the composite was not within specifications for lightweight particles and gradations. As a result, from August 29 to August 31, Border States submitted at least three more sets of Class S bin splits that ultimately failed in part because of lightweight particle problems.

[¶41.] Based on this evidence, the court found that had the DOT "run the lightweight test before the August 26, 2005 mix design and discovered it would fail, Morris could have immediately addressed that problem." It further concluded that

the DOT "not having the lightweights prior to approving the August 26 mix design delayed the project at least three or four days." Finally, the court ruled that the DOT "breached its contractual obligation to perform the quality tests, including . . . lightweight particles . . . prior to approving the August 26, 2005 job mix formula/mix design to the direct and proximate detriment and damage of Border States and Morris as a matter of law."

[¶42.] In response to the court's findings and conclusions, the DOT argues that there is no contract or agreement requiring it to run the lightweight test before approving a mix design. The DOT directs this Court to the Materials Manual, *Minimum Sample and Test Requirements*, 1.1(A)(3), in which the DOT is required to test for lightweight particles the first three days of production. The DOT further claims the court erred when it declared that "[t]he lightweight test is a quality test," and then ruled that it breached contractual duties by not performing such quality test, which alleged breach damaged Morris.

[¶43.] The controlling agreements in this case indicate that the lightweight particles test is an *acceptance* test, contrary to the circuit court's conclusion. First, the Materials Manual indicates that the lightweights test is an acceptance test conducted for asphalt concrete. Materials Manual, *Minimum Sample and Test Requirements*, 1.1(A)(3). Also, the definition of an acceptance test is a "test used for determining the acceptability of the materials and the workmanship which have been or are being incorporated in the project." Materials Manual, *Samples, Tests, and Certificates*, 5.1(Definition). A "quality test," on the other hand, is defined as a test "to determine a material's suitability for specific applications and includes tests

not normally conducted for *Acceptance* or Independent Assurance (abrasion, durability, soundness, etc.)." *Id.* at 5.5 (emphasis added). Quality tests are "generally performed on samples representing materials *proposed for use*, or samples *from* a material's production site prior to its use[.]" *Id.* (emphasis added).

[¶44.]     The controlling agreements further support the conclusion that the DOT was not required to run the lightweight particles test before approving the August 26, 2005 mix design. The Materials Manual, *Samples, Tests, and Certificates*, 5 (Operational Procedure) states that the test samples shall be "[o]btained at a production or processing plant . . . ." Here, the DOT tested for lightweight particles for Border States' plant calibration. Because the Materials Manual did not require the DOT to test for lightweight particles before approving a mix design, the court erred in concluding that the DOT breached a contractual obligation for failing to do so.

[¶45.]     There was also no evidence to support the circuit court's conclusion that had the DOT tested for lightweights before August 26, 2005, Morris would have been able to "immediately address that problem." Specification 320(C)(2) mandates that the contractor "run process control tests on the mineral aggregate when producing material. A gradation, PI, crushed and *lightweight particles test* shall be run for every 1500 tons (1500 metric tons) produced per pile." (Emphasis added.) Neither Border States nor Morris ran the necessary lightweight test on its materials. Had they done so, perhaps the lightweight particles problems would have been discovered and remedied before August 26, 2005. Further, after August

26, 2005, Border States continued to face lightweight problems after it submitted at least three additional bin splits, all of which continued to fail the lightweight tests.

### f. Gradation

[¶46.]    At trial, Root testified that the Standard Specifications required the DOT to calculate a job mix formula and then apply certain narrow band tolerances from Specification 320.2A related to the mix design's gradation. In Root's opinion, the parties' contract, which specifically provided and overrode the Standard Specifications, did not impact the application of Standard Specification 320.2A, but only Specification 880. The court agreed with Root, and found that the DOT "did not properly apply the Specification Section 320.2A tolerances to the job mix formula resulting in the delays which caused the job to be carried over into 2006."

[¶47.]    First, the court's reasoning overlooked the fact that after August 26, 2005 the materials submitted did not pass the DOT's lightweight particles test, and therefore, even if the DOT had applied the narrow band tolerances of section 320.2A to the gradations and passed the materials, Border States was facing repeated lightweight test failures. Second, Border States testified that it understood that the DOT required its materials to meet the gradation requirements of Contract Plan Sheet F-3, and relied on the DOT to apply the contract gradation limits. Third, there is no support in the record for the court's declaration that the failure to use the tolerances in Specification 320.2A alone caused the job to be carried over into 2006. The fact the parties contracted for and understood Contract Plan Sheet F-3 would control the gradation requirements, and there being no evidence that the

failure to apply the tolerances of Specification 320.2A harmed Morris, the court erred in finding a breach on this issue.

### 2. Proximate (Legal) Cause

[¶48.]     The DOT asserts that Morris's alleged damages were proximately caused by its "own actions and inactions, and not the minimal delay on the part of DOT in notifying Border States of the calculation error[.]"  In response, Morris makes no argument and points to no evidence in the record that its damages were proximately caused by the DOT's actions.  Rather, it relies on the court's overbroad declarations, which held that everything the DOT did or failed to do damaged Morris.

[¶49.]     During its argument to this Court, counsel for Morris asserted that had the DOT applied the C88 precision during the sodium sulfate soundness testing, Morris's materials would have passed, and the failure to apply the precision proximately caused Morris's damages.  The C88, however, does not mandate consideration of precision.  Moreover, Morris was aware that its materials for the Class S needed to pass with a 12% on the plus four, with no mention of the C88 precision.  Finally, as discussed earlier, even if Morris's materials would have passed with less than a 12% on the plus four in July 2005, there was no evidence that Morris's materials would have met the lightweight and gradation requirements.

[¶50.]     Certainly, the DOT erred when it orally informed Morris that the August 2, 2005 materials passed the soundness test.  Yet we are unable to find evidence in the record that this error alone caused the entire project to breakdown

and not get completed by September 15, 2005. The record abundantly shows other problems Morris and Border States faced both before August 2, 2005 and after August 18, 2005, which problems affected the project. The circuit court's findings never sort out these problems in relation to the project as a whole. Rather, the findings take each act and failure to act on the part of the DOT and declare a breach and damages. Such a leaping analysis cannot be upheld. There being insufficient evidence that the DOT's erroneous pass report on August 2, 2005 proximately damaged Morris, we reverse the court's judgment and damages award against the DOT. In view of our decision, we need not reach the other appeal issues.

[¶51.] Reversed.

[¶52.] GILBERTSON, Chief Justice, and SEVERSON, Justice, and CALDWELL, Circuit Court Judge, and MEIERHENRY, Retired Justice, concur.

[¶53.] CALDWELL, Circuit Court Judge, sitting for ZINTER, Justice, disqualified.

[¶54.] WILBUR, Justice, not having been a member of the Court at the time this action was submitted, did not participate.